**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON WISEMAN, d/b/a JASON ANARCHY GAMES, WISEMAN INNOVATION<br><br>Plaintiff,<br><br><br>v.<br><br><br>Marc Goldner, individually and as officer of GOLDEN BELL ENTERTAINMENT LLC and GOLDEN BELL STUDIOS, LLC and GOLDEN ENTERTAINMENT LLC and GOLDEN STUDIOS, LLC<br><br>Defendants. | No.<br><br>**ECF Case**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jason Wiseman, by and through his undersigned attorneys, Chinta Perdomo Berks & Fratangelo LLP, for his complaint against Defendants Marc Goldner, individually and as president of Golden Bell Entertainment, LLC and Golden Bell Studios, LLC and Golden Bell Entertainment, LLC., and Golden Bell Studios, LLC., alleges as follows based on his personal knowledge and upon information and belief:

**THE PARTIES**

1.      Plaintiff, JASON WISEMAN, doing business as "Jason Anarchy Games" and "Wiseman Innovation" ("Mr. Wiseman") is, and at all times hereinafter mentioned was, a resident of Canada.

2.      Defendant, GOLDEN BELL ENTERTAINMENT, LLC ("Golden Bell") on information and belief is, and at all times hereinafter mentioned was, a limited liability company organized under the laws of the State of California, with a principal place of business located at 15 Peacock Drive, Roslyn, New York 11576 and  with a

1

registered agent for service of process located at c/o California Corporate Agents, Inc.,
Attn: Alex Patel, 16830 Ventura Blvd, Encino, California 91436.

3.      Defendant GOLDEN BELL STUDIOS, LLC ("Golden Bell Studios")
on information and belief is, and at all times hereinafter mentioned was, a limited liability
company organized under the laws of the State of Nevada, with principal place of
business located at 37 Northern Blvd, Suite 324, Greenvale, New York 11548 and with a
registered agent for service of process located at c/o CSC Services of Nevada, Inc., 2215-
B Renaissance Drive, Las Vegas, Nevada 89119.

4.      Defendant, MARC GOLDNER ("Goldner") on information and belief
is, and at all times hereinafter mentioned was, a resident of the County of Nassau, State
of New York. Upon information and belief, Golden Entertainment, LLC and Golden Bell
Studios, LLC are *alter egos* of Goldner and of one another. In addition, upon information
and belief, Goldner owns and controls these companies which he personally operates
from his home in Long Island and uses these companies interchangeably in dealings with
third parties.


**NATURE OF THE ACTION**

5.      This action is for a declaratory judgment and for monetary damages
sustained by Plaintiff as a direct result of Defendants' tortious and egregious conduct
including, inter alia, fraudulent misrepresentation under the Digital Millennium
Copyright Act, ("DMCA"), fraud in the inducement, tortious interference with
contractual relations, breach of fiduciary duty, libel and in the alternative, breach of
contract and other related claims.

## JURISDICTION AND VENUE

6.      This court has federal question jurisdiction over this action under 28 U.S.C. §§1331 and 1338 and the Digital Millennium Copyright Act.

7.      This Court also has diversity jurisdiction over this action under 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 (seventy-five thousand dollars).

8.      This Court has supplementary jurisdiction over all claims arising under state law under 28 U.S.C. § 1367(a).

9.      For declaratory counts, this Court has jurisdiction under 28 U.S.C. §§2201-02.

10.      Upon information and belief, venue is proper in this district under 28 U.S.C. §1391 because the Defendants reside in this district under the statutory definitions.

## FACTUAL BACKGROUND

11.      Plaintiff Jason Wiseman is a well-known board and card games creator and independent publisher.  Mr. Wiseman has conceived many successful card games including the games "Drinking Quest", "Parenting is Easy", "Pretending to Grownup", "Haiku Warrior" and many others. Plaintiff's reputation in the card game industry has allowed Plaintiff to collaborate with other successful creators around the world with hundreds of thousands of digital followers in multiple social media platforms.

12.       In 2016, Plaintiff conceived and created a game entitled "Pretending to Grownup" in collaboration with 33 well-recognized cartoonists. Plaintiff launched a crowdfunding campaign on Kickstarter for the game, which generated CA$220,266, the

equivalent of US$167,644.17 from 5,988 backers who pre-ordered the game to fund

production.  Exhibit 1 to the Declaration of Jason Wiseman.

<b>The Purchase Agreement</b>

13.      In January 2017, Defendant Goldner, in his capacity as an officer of

Golden Bell, approached Plaintiff with a proposal to publish and distribute Plaintiff's

game "Pretending to Grownup".

14.      In his introductory email to Plaintiff, Goldner wrote "we've been

scouring the internet for some great games to partner up with, and this caught our eye

immediately."  Goldner expressed his interest in "Pretending to Grownup" and further

wrote "we would love to meet with you about discussing a publishing and distribution

deal for your product."  **Exhibit 2 to the Declaration of Jason Wiseman.**

15.      Initially, Plaintiff was not interested in collaborating with Goldner in

connection to the game "Pretending to Grownup" because at the time of Goldner's

approach, Plaintiff had raised sufficient funds to cover the expenses for the initial print

run for 25,000 copies of "Pretending to Grownup" and had independently secured the

necessary distribution channels. Specifically, Plaintiff paid $63,014.75 for the

manufacturing of the games and shipping from the manufacturer plus an additional

$30,000 for artwork, advertising and promotion.  **Declaration of Jason Wiseman at ¶**

**10.**

16.      Plaintiff expressed to Defendant Goldner that he was willing to execute

an agreement in connection to other projects and a second print run of the game

"Pretending to Grownup." Defendant Goldner insisted on an agreement involving the

first print run of "Pretending to Grownup." **See Declaration of Jason Wiseman at ¶ 11.**

4

17.      In order to induce Plaintiff to sign an agreement with Defendants that would include the game "Pretending to Grownup" Goldner offered Plaintiff, *inter alia*, to cover all the shipping costs of approximately 6,000 copies of the game "Pretending to Grownup" which were meant to cover all BakerKit orders including the Kickstarter backers and other pre-orders, at no cost to Plaintiff.  **See Exhibit 4 to Jason Wiseman Declaration, p. 1 at ¶ 4d) and p. 2.**

18.      Additionally, Goldner represented to Plaintiff that by signing a deal with Golden Bell Plaintiff would benefit from Defendants distribution channels which included "big box" retailers, more exposure at toy conventions and overall substantially more sales. **See Exhibit 3 to Jason Wiseman Declaration at p. 2 (January 22, 2017 email from Marc Goldner.)**

19.      On or about January 22, 2017, Defendant Goldner represented to Plaintiff that at the New York Toy Fair alone, Golden Bell had a minimum of 10,000 expected purchase orders from major retailers such as Toys R Us, Target, and Wal-Mart, and BJs and that by executing an agreement with Golden Bell as distributors Plaintiff would sale at least 10,000 game units per quarter. **Id.**

20.      Goldner, however, did not want to sign an agreement without "Pretending to Grownup**."  Exhibit 4 to the Declaration of Jason Wiseman, p. 4 (February 11, 2017 email from Marc Goldner**).

21.      Goldner represented to Plaintiff the "Pretending to Grownup" units would be delivered to Kickstarter backers and that Defendants were covering all shipping costs to induce Plaintiff to sign the Purchase Agreement and include the game "Pretending to Grownup." **Id at p. 2 ¶ 2.**

22.     On February 11, 2017 Plaintiff informed Goldner that it was Plaintiff's priority to timely deliver the initial print run of the game "Pretending to Grownup" to the Kickstarter backers to preserve Plaintiff's reputation in this crowdfunding platform. **See Exhibit 4 to the Declaration of Jason Wiseman at p. 3 (February 11, 2017 email from Jason Wiseman (Drinking Quest)).**

23.     Defendant Goldner created a false sense of urgency for Plaintiff to execute the Purchase Agreement by stating that "time was of the essence" and expressing to Plaintiff that Defendants wanted the works on Golden Bell's catalog in time for the New York Toy Fair. **See Id. at p. 4 (February 11, 2017 email from Marc Goldner.)**

24.     During the final negotiations of the night of February 11th, Plaintiff expressed his concern to Defendant Goldner that due to the rush in executing the Purchase Agreement, Plaintiff's counsel did not have the opportunity to review it.  In response, Goldner ensured Plaintiff that "we can do amendments if needed in good faith." **See Exhibit 5 at p. 3 to the Declaration of Jason Wiseman.**

25.     On the night of February 11 and into the early morning of February 12, 2017, Plaintiff relying on Defendant Goldner's promises, executed a Purchase Agreement with Golden Bell Entertainment, LLC (the "Purchase Agreement") in connection to four (4) games, (hereafter, the "Works") as follows: "Pretending to Grownup", "Turtles Riding Airships," "Parenting" and "Webcomic Name Game."  **Exhibit 6 to the Declaration of Jason Wiseman.**

26.     Plaintiff executed the Purchase Agreement in good faith and had acquired all necessary clearances with Plaintiff's Collaborators prior to delivering the games to Defendants.

27.      By executing the Purchase Agreement, Plaintiff expected to receive a total of $62,500 in advances against 10% royalties on Defendant's net sales of each game and a minimum income per game of approximately $70,000 on the first year of Defendants' commercial distribution of the games through their big box retailers, toy conventions and electronic commerce retailers including Amazon.  **See Declaration of Jason Wiseman at ¶¶ 27-28.**

28.      Under the Purchase Agreement, Defendant Golden Bell agreed to act as Plaintiff's agent to publish and distribute the Works. **Exhibit 6, p. 2, ¶ E, to the Declaration of Jason Wiseman.**

29.      Defendants promised and agreed to commercially exploit the Works and pay Plaintiff 10% or 8% of the net sales of the Works according to the Agreement. See **Exhibit 6, p. 1, ¶ D to the Declaration of Jason Wiseman**.

### "Pretending to Grownup"

30.      Under the terms of the Purchase Agreement, in exchange for Plaintiff's grant of rights to the game "Pretending to Grownup" to Defendant Golden Bell, Plaintiff was expecting to receive the following monetary consideration from Defendant:  (i) an advance of $5,000 plus an additional $5,000 for each additional  expansion packs for a total of $20,000 in advances against royalties; (ii) an additional $5,000 payment in exchange for the right to exclusively distribute the game after September 2018; and (iii) a royalty of 10% on net sales paid quarterly until September 2018, thereafter, the royalty would decrease to 8% royalty on net sales with a maximum payment cap of $500,000. **See Id.**

31.     In addition to the monetary consideration, Defendants agreed that Plaintiff would retain the non-exclusive right to sell "Pretending to Grownup" until September 2018 and that Defendants would cover all shipping costs for the games' Kickstarter bakers as well as warehousing Plaintiff's 9,000 additional copies of the game at Defendants' expense which Plaintiff had retained non-exclusive right to sell before September 1st, 2018 under the Purchase Agreement. **See Id.**

32.     Plaintiff delivered the "Pretending to Grownup" digital files on February 12, 2017 and the copies of the physical game on June 7, 2017 along with the BakerKit orders list. **See Jason Wiseman's Declaration at 30 and Exhibit 7 to Jason Wiseman's Declaration.**

33.     Defendants paid Plaintiff the initial $5,000 advance but failed to pay any additional advances, including the agreed upon $5,000 fee for the exclusive right to sell "Pretending to Grownup" after September 2018.

34.     As a result of Defendant's failure to make the agreed upon payment to secure exclusive distribution after September 2018, Plaintiff has retained his right to commercially exploit the game "Pretending to Grownup".

35.     In addition, Plaintiff was ready, willing and able to work and deliver the agreed upon "Pretending to Grownup" expansion packs. However, as Defendant Goldner refused to pay Plaintiff the agreed upon $5,000 advance for each expansion, Plaintiff informed Goldner that he would not be delivering the expansions unless the agreed upon advance was paid.

36.     Defendants are selling the game "Pretending to Grownup" for $29.95 per unit on their website www.goldenbellstudios.com and Amazon.com. **Exhibit 8 to the Declaration of Jason Wiseman.**

37.     Defendants failed to pay Plaintiff the agreed upon royalties in connection to the sales of the game "Pretending to Grownup" and send Plaintiff accurate royalty statements accounting for the sales of the game.   **See Declaration of Jason Wiseman at ¶ 34.**

### "Turtles Riding Airships"

38.     Under the terms of the Purchase Agreement, in exchange for Plaintiff's grant of rights to the game "Turtles Riding Airships" to Defendant Golden Bell, Plaintiff was expecting to receive the following monetary consideration (i) a $7,500 advance following Plaintiff's execution of the Purchase Agreement; (ii) a $7,500 advance upon Plaintiff's delivery of the final print-ready files, PSD files, AI files, and InDesign files; and (iii) a royalty of 10% on net sales paid quarterly for the first 18 months after the production of the game and thereafter an 8% royalty on net sales with a maximum payment cap of $500,000 **See Exhibit 6, p. 1, ¶G, to the Declaration of Jason Wiseman.**

39.     In addition to the monetary compensation, Defendants agreed to deliver 1,100 complimentary copies of the game to Plaintiff.   **Id.**

40.     Plaintiff delivered the game "Turtles Riding Airships" to Defendants on June 15, 2017, including all final print ready files.   **See Declaration of Jason Wiseman, ¶35.**

41.     Notwithstanding Plaintiff's delivery of the print ready files, Defendants only paid Plaintiff the first advance in the amount of $7500. **Id. at ¶¶35–36**

42.     Defendants failed to pay Plaintiff the second advance in the amount of $7,500.  **Id. at ¶ 36.**

43.     Upon information and belief, Defendants have failed to commercially exploit the game and act in the best interest of the Plaintiff as required by Defendants agency commitment in the Purchase Agreement.

## "Parenting is Easy"

44.     Under the terms of the Purchase Agreement, in exchange for Plaintiff's grant of rights to the game "Parenting is Easy" to Defendant Golden Bell, Plaintiff was expecting to receive the following monetary consideration (i) a $6,250 advance following Plaintiff's execution of the Purchase Agreement; (ii) another $5,000 advance upon Plaintiff's delivery of the final print-ready files, PSD files, AI files, and InDesign files; and (iii) a royalty of 10% on net sales paid quarterly for the first 18 months after the production of the game and thereafter an 8% royalty on net sales with a maximum payment cap of $500,000.  **See Exhibit 6, p. 2 ¶ I, to Declaration of Jason Wiseman.**

45.     Plaintiff delivered all final print ready files to Defendants on February 13, 2018. **See Declaration of Jason Wiseman at ¶ 37.**

46.     Notwithstanding Plaintiff's delivery of the print ready files, Defendants only paid Plaintiff 50% of the first advance in the amount of $3,125. **Id. at ¶38.**

47.     Defendants launched "Parenting is Easy" on Kickstarter and are selling this game for $49.95 per unit on their website, www.goldenbellstudios.com. **Exhibit 9 to the Declaration of Jason Wiseman.**

48.     Upon information and belief, Defendants launched a successful Kickstarter campaign for "Parenting is Easy" which generated approximately $100,000.00 from individual backers on the platform.

49.     Yet, Defendants failed to pay Plaintiff any royalties in connection to the sales of the game "Parenting is Easy" and have failed to send Plaintiff accurate royalty statements accounting for the sales of the game.

**"Webcomic Name Game"**

50.     Under the terms of the Purchase Agreement, in exchange for Plaintiff's grant of rights to the game "Webcomic Name Game" to Defendant Golden Bell, Plaintiff was expecting to receive the following monetary consideration (i) a $6,250 advance following Plaintiff's execution of the Purchase Agreement; (ii) another $5,000 advance upon Plaintiff's delivery of the final print-ready files, PSD files, AI files, and InDesign files; and (iii) a royalty of 10% on net sales paid quarterly for the first 18 months after the production of the game and thereafter an 8% royalty on net sales with a maximum payment cap of $500,000. In addition to the monetary compensation, Defendants promised to deliver 1,100 complimentary copies of "Webcomic Name Game" to Plaintiff.  **See Exhibit 6, p. 2, ¶ H to the Declaration of Jason Wiseman.**

51.     Plaintiff delivered all final print ready files to Defendants October 2, 2018.

52.     Notwithstanding Plaintiff's delivery of the print ready files, Defendants failed to pay Plaintiff any of the agreed upon advances in the amount of $11,250 in connection to this game.

53.     Defendants have failed to print and release this game.

54.     Defendants had an obligation to commercially exploit the game in accordance with the provisions of the Purchase Agreement.

55.     Following execution of the Purchase Agreement, Plaintiff satisfactorily delivered all of the Works to Defendants under the Purchase Agreement in good faith.

56.     On June 7, 2017 Plaintiff provided Golden Bell with a list of the Kickstarter backers to ship the agreed upon 6,000 units of "Pretending to Grownup" providing Defendants with detailed shipping instructions to ensure the satisfactory fulfillment of all the orders. **See Exhibit 7 to the Declaration of Jason Wiseman.**

57.     As an independent game developer and publisher, Plaintiff always took care of his reputation with his Kickstarter backers because they are essential to Plaintiff's business.  Plaintiff ensured that Defendants were delivering the units of "Pretending to Grownup" to the backers without delays and provided Defendants with detailed and specific shipping instructions to avoid potential issues or delays.  **See Declaration of Jason Wiseman at ¶¶ 13, 47.**

58.     Knowing the importance of a timely deliver to Plaintiff's Kickstarter backers, Defendants conditioned delivery of the units on Plaintiff execution additional Addendums to the Purchase Agreement.

59.     Through coercive tactics and duress, Defendants induced Plaintiffs to sign three additional Addendums to the Purchase Agreement (the "Addendums"). **Exhibits 10, 11, 12 to Jason Wiseman Declaration are Addendum 1, 2 and 3, respectively.**

60.     Pursuant to the Addendums, Plaintiff was forced to agree to create and deliver to Defendants five additional games (the "Bonus Games"). See **Declaration of Jason Wiseman at ¶¶ 51-53.**

61.     Plaintiff did not receive compensation from Defendants for the Bonus Games but for an advance in the amount of $2,500 only for the game "Frosty Cats / Minty Kitties." **Id at ¶ 52.**

62.      The additional "Bonus Games" include (i) "Die Trying" delivered on March 21, 2018; "Lost: Orientation" delivered on April 29, 2018; "Garfield and the Quest for the Golden Lasagna" delivered on August 26, 2018; "Message in a Bottle" delivered on August 19 and August 27, 2018; "Dungeon Building Game" delivered on March 19, 2018. **See Declaration of Jason Wiseman at ¶ 53.**

63.      Defendants attempted to convince Plaintiff to sign a fourth Addendum pursuant to which Plaintiff would assign all of his future works to Defendants.  **Id at ¶ 54, 55.**

64.      Plaintiff refused to sign Defendants proposed Fourth Addendum and sought the advice of counsel to terminate the Purchase Agreement with Defendants and put an end to Defendants coercion which purpose was to ensure that Plaintiff would continue to develop and deliver games to Defendants against Plaintiff's will.  Declaration of Jason Wiseman ¶ **55.**

**Plaintiff's Reputation and Contacts in the Industry**

65.      Plaintiff Jason Wiseman has been creating and developing games since 2011 and has successfully raised the funds necessary to market, develop and distribute his games.  **See Declaration of Jason Wiseman at ¶ 2.**

66.      Mr. Wiseman makes approximately $70,000 in net revenue per game and has been developing and mastering the trade on his own for roughly 8 years.   During this time, Plaintiff has developed an outstanding reputation among his followers and peers which has allowed Plaintiff to collaborate with many designers, cartoonists and visual artists who are an integral part of Mr. Wiseman's business. Id at ¶ **5, 28.**

67.     Plaintiff's Collaborators are a group of highly unique and well-known visual artists and creators that agreed to work with Plaintiff solely based on Plaintiff's reputation.  **Declaration of Jason Wiseman at ¶ 6.**

68.     It is industry practice for visual artists and creators to have simple agreements in place and clearances are oftentimes based on short form documents, electronic messages, reputation and trust.  **Id at ¶ 7.**

69.     The livelihood of Plaintiff's Collaborators is directly associated with their online presence which is oftentimes embodied in the characters they create, share and publish through websites and social media. **Declaration of Jason Wiseman at ¶ 7.**

70.     Early in the negotiations leading to the Purchase Agreement, Plaintiff explained to Goldner that his collaborators were retaining their rights over the characters featured in the games as is often arranged in the industry.  The games are collective Works between Plaintiff and his collaborators. **See Declaration of Jason Wiseman at ¶¶ 19.**

71.     With respect to Megan McKay ("McKay") one of Plaintiff's Collaborations, Plaintiff informed Goldner that McKay, the creator of the character "Unipegasaurus" retained her right to use the character "Unipegasaurus" outside the context of the game "Pretending to Grownup" and specifically emphasized McKay's intention to make plush toys. **See Exhibit 5 and Exhibit 14 to the Declaration of Jason Wiseman.**

72.     On February 14, 2017, Plaintiff brought to Goldner's attention that the Purchase Agreement had an error with regards to Megan McKay's use of "Unipegasaurus" and that the Agreement was supposed to clearly and unequivocally allow McKay the exclusive right to use the character outside the context of "Pretending

to Grownup."  Plaintiff captures the screenshot of his initial instructions to Defendant

Goldner regarding McKay's rights to illustrate how he had advised him that McKay had

the intention to create plush toys. Goldner, however, simply disregarded Plaintiff's

requests despite earlier written assurances that corrections will be available in good faith.

**See Exhibit 14 to Jason Wiseman's Declaration**.

73.     Since Defendants failed to make the requested amendment, McKay

refused to authorize Defendants' use of "Unipegasaurus" for "Pretending to Grownup."

**Goldner's Misrepresentations and Duress**

74.     Defendants have attempted to legitimize their use of certain game

characters outside the context of the Works by filing fraudulent trademark applications

before the United States Patent and Trademark Office ("USPTO").     **See Exhibits 15,**

**(Golden Bell's trademark application for "Unipegasaurus"); Exhibit 16 (Golden**

**Bell's trademark application for "Drinking Quest") and Exhibit 17 (Golden Bell's**

**trademark application for "Heck:Tiny Card Game") to the Declaration of Jason**

**Wiseman.**

75.     Thus, on November 21, 2018, Defendants applied for trademark

protection of the game "Drinking Quest" which Plaintiff developed in 2011, at least 7

years prior to engaging Defendants as a distributor.   **See Exhibit 16 to the Declaration**

**of Jason Wiseman.**

76.     On June 21, 2017, Defendant Goldner submitted a fraudulent trademark

application for the name "Unipegasaurus" in two international classes, 016 covering

"Prints; Stickers; Cartoon prints; Graphic prints", in class 028 covering "Board games;

Card games; Game cards; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy

animals; Tabletop games; Playing cards and card games; Stuffed and plush toys"

knowing that McKay was retaining the right in the name and had the intention to make plush toys. **See Exhibit 5, Exhibit 13 and Exhibit 15 to Jason Wiseman's Declaration.**

77.     Defendant Goldner used, among other tactics, the dispute with McKay to coerce Plaintiff into executing additional Addendums to the Purchase Agreement. **See Declaration of Jason Wiseman at ¶ 50.**

78.     In July 2017, Goldner informed Plaintiff that Defendants' investors were insisting that Plaintiff sign a Second Addendum to ensure Plaintiff did not become a risk similar to McKay. **Id.**

79.     In the days leading up to July 2, 2017, Plaintiff was still waiting for Defendants to ship the agreed upon units of "Pretending to Grownup" to the Kickstarter backers and he contacted Goldner to follow up.  In response, on July 4, 2017 Goldner informed Plaintiff Defendants were refusing to ship the copies of the game to the backers until McKay assigned "Unipegasaurus" to Defendants.  **See Exhibit 13 to the Declaration of Jason Wiseman.**

80.     Plaintiff was surprised and outraged at Goldner's tactics, particularly when Defendants decided to unreasonably delay in fulfilling the Kickstarter orders of "Pretending to Grownup" as Plaintiff clearly mention how important these orders were for his reputation with the backers and Kickstarter.   As a result of Defendants' tortious conduct, Plaintiff has received multiple grievance messages from Kickstarter backers regarding the shipment Defendants agreed to fulfill. **See Exhibit 23 to the Declaration of Jason Wiseman.**

81.     On July 25, 2017 Plaintiff was forced to sign a Second Addendum to the Purchase Agreement, whereby Plaintiff agreed to create and deliver additional works to

Plaintiff, "Frosty Cats" and "Message in a Bottle" in exchange for Defendants to ship the 6,000 pre-order units of "Pretending to Grownup" to the Kickstarter backers. **See Exhibit 11 to the Declaration of Jason Wiseman.**

82.     Plaintiff complied with all his obligations under the Purchase Agreement and more. He delivered the digital files of "Pretending to Grownup" on February 12, 2017 and the physical games "Pretending to Grownup" on June 9, 2017. Plaintiff also delivered the digital files of "Turtles Riding Airships" on June 15, 2017 and the digital files of "Parenting" on February 13, 2018, among others. The files for Webcomic Name Game were delivered by the artist on Oct 2, 2018. **See Declaration of Jason Wiseman.**

83.     On August 28, 2017 Plaintiff signed a third Addendum with Golden Bell for the game "Die Trying", which Plaintiff had developed with another collaborator and highly respected game designer. Defendants never paid Plaintiff an advance for this game. Plaintiff delivered this game out of fear of completely losing his reputation in the industry and as a result of Defendants coercive tactics, including threats of legal action for no apparent reason. **Id at 51, 53 and Exhibit 12**

84.     Defendants fraudulent trademark for "Unipegasaurus" was allowed by the USPTO and published for opposition on October 31, 2017. On February 28, 2018, Megan McKay filed an opposition to Defendants' trademark application of "Unipegasaurus" based on fraud to the USPTO.  **See Exhibit 18 to the Declaration of Jason Wiseman.**

85.     Upon information and belief, Megan McKay's opposition to Defendants trademark application for "Unipegasaurus" was the result of Defendants' decision to ignore Plaintiff's unequivocal directives that McKay owned "Unipegasaurus" and retained the use of the character, on an exclusive basis, outside the context of the game.

86.     Upon information and belief, Defendants used McKay's opposition to coerce Plaintiff into signing additional addendums to the Purchase Agreement and ensure that Plaintiff would somehow pay for McKay's settlement.

87.     On March 15, 2018 Defendant Marc Goldner demanded that Plaintiff pay $30,000 to cover Defendants' costs for the settlement with Megan McKay.  **See Exhibit 19 to Wiseman Declaration.**

88.     Plaintiff initially offered Defendants 2,000 units of "Pretending to Grownup" to cover the $30,000 but that number later changed to 1,500 units had a potential revenue of approximately $45,000.   Defendants accepted. **Id at p. 1.**

89.     On March 19, 2018 Defendant Goldner sent Plaintiff a proposal entitled "Bringing Jason Wiseman Stateside Proposal" (the "Stateside Proposal") according to which Defendants were offering to acquire all of Plaintiff's past, present and future intellectual property including the games "Drinking Quest" and "Le Neckbeard".   **See Exhibit 20 to the Declaration of Jason Wiseman.**

90.     Plaintiff immediately rejected Defendants' Stateside Proposal and by responding that "under no circumstance will I ever sign over ALL WORKS by me or my company." **Id. at 1.**

91.     Notwithstanding Plaintiff's unequivocal rejection, Defendant Goldner sent Plaintiff a proposed Fourth Addendum pursuant to which Plaintiff would grant Defendants a "365-Day option on the Creator's next works." **Declaration of Jason Wiseman Exhibit 20.**

92.     Defendant Goldner actively insisted that Plaintiff sign the Fourth Addendum arguing, *inter alia*, that Defendants already had rights over Plaintiff's past, present and future work.   Id at ¶ 69.

93.     Plaintiff realized that Defendant Goldner would not stop until he obtained the rights on Plaintiff's entire livelihood as a game developer and was now convinced that Defendants goal from inception was to constructively evict Plaintiff from his own business and acquire the rights on Plaintiff's works. **Declaration of Jason Wiseman at ¶ 71.**

### Defendants Threats to Misappropriate "Heck:  A Tiny Card Game"

94.     In late September 2018, Plaintiff was preparing to launch a Kickstarter campaign for a card game he independently created entitled "Heck: A Tiny Card Game" ("Heck").  Plaintiff created and developed Heck with one of his collaborators, Alex Cohen. The "Heck" game had absolutely no ties to the games or "Works" Plaintiff sold to Defendants under the Purchase Agreement.  **Declaration of Jason Wiseman at ¶ 72.**

95.     On October 1, 2018, Plaintiff received an email from Defendant Goldner in which he alleged that Plaintiff needed Defendants' approval before launching the Kickstarter campaign for Heck.  **See Exhibit 21 to the Declaration of Jason Wiseman.**

96.     The October 1, 2018 email exchange was followed by "cease and desist" from Defendant Marc Goldner to Plaintiff and to Plaintiff's Collaborator, Alex Cohen. **Exhibit 22 to the Declaration of Jason Wiseman; See also Declaration of Alex Cohen.**

97.     Shortly thereafter, Plaintiff sought counsel advice in New York. Id at ¶ 76.

98.     On October 8th, 2018, Plaintiff sent a written notice to Defendants formally terminating the Purchase Agreement.  **Exhibit 24 to the Declaration of Jason Wiseman.**

99.     On October 9th, 2018 Plaintiff launched the "Heck" Kickstarter campaign. **Declaration to Jason Wiseman at ¶ 78.**

100.     On November 21, 2018, Defendants filed two trademark applications before the USPTO seeking to register "Heck: Tiny Card Game" and "Drinking Quest" with the intent to misappropriate the names from Plaintiff and as an intimidation tactic in an attempt to coerce Plaintiff into assigning his rights on Heck to Defendants. **See Exhibit 16 and Exhibit 17 to the Declaration of Jason Wiseman.**

101.      Defendants misrepresented to the United States Patent and Trademark Office ("USPTO") that they had been using the name "Heck: Tiny Card Game" in connection to "card games" and "tabletop games" under international class 028, since October 9, 2018.  Defendants submitted as their purported specimen of use a screen shot of Plaintiff's Kickstarter campaign.  **See Declaration of Jason Wiseman at ¶ 80.**

102.     With respect to the mark "Drinking Quest," Golden Bell claimed use of the mark in commerce since December 19, 2011 which is an easily verifiable misrepresentation to a government agency such as the USPTO  **See Exhibit 16 to the Declaration of Jason Wiseman and ¶ 61 of the Declaration.**

103.     In fact, it would have been impossible for Defendants to have used the name "Drinking Quest" back in 2011 when Defendants were not even in business at that time.  It cannot be disputed that Plaintiff and not Golden Bell created the name "Drinking Quest," purchased a domain name and launched a website to host the game in for the first time on December 19, 2011.  **See Id at ¶ 61.**

104.     On November 26, 2018 Defendant Goldner sent a notice to Kickstarter under the Digital Millennium Copyright Act (the "DMCA") misrepresenting that Plaintiff had infringed on Defendants' copyright of Heck.  As a result, Kickstarter refused to

release Plaintiff's funds from his Heck campaign for approximately 3 weeks causing

Plaintiff to incur in additional out of pocket losses and counsel fees.   **See Declaration of**

**Jason Wiseman, ¶ 80.**

105.    In an effort to tarnish Plaintiff's reputation in the industry, Defendant

Goldner sent a correspondence to Jonathan Rawlings an artist with whom Plaintiff

collaborated on a project called "Le Neckbeard".   **See Declaration of Jonathan**

**Rawlings.**

106.    On December 1, 2018, Defendant Goldner harassed Plaintiff with

multiple text messages and in person during a convention in Philadelphia making

additional threats in order to intimidate Plaintiff into seeking court assistance to resolve

the issues with Defendants.   **See Declaration of Jason Wiseman, ¶ 83.**

### AS AND FOR A FIRST CAUSE OF ACTION FOR
### MISREPRESENTATIONS UNDER SECTION 512(F) OF THE DMCA
### (against All Defendants)

107.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1

through 106 as though fully set forth herein.

108.    Defendants were aware that Plaintiff launched a Kickstarter campaign

for the game "Heck: A Tiny Card Game" after the termination of Plaintiff agreements

with Golden Bell.

109.    Defendants knew that "Heck" was not one of the games included in the

Purchase Agreement or any of the subsequent Addendums executed between the parties

and that Defendants did not own the copyright or any other proprietary rights in the

game.

110.     Nevertheless, Defendants willfully or wantonly disregarded these facts and filed a claim with Kickstarter for copyright infringement against Plaintiff.

111.     Kickstarter suspended the project and delayed the disbursement of the funds Plaintiff raised thought the crowdfunding platform as a result of Defendants' misrepresentations.

112.     Plaintiff holds copyright registration for the game Heck.

113.     To defend against Defendants false claims, Plaintiff incurred additional expenses including counsel fees.

114.     In addition, Plaintiff sustained damages to his reputation with Kickstarter which is an essential revenue stream for Plaintiff's business.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants joint and severally:

(i)     Awarding Plaintiff monetary damages for his out of pocket losses as a result of Defendants' fraudulent complaint to Kickstarter;
(ii)    Awarding Plaintiff compensatory damages in an amount to be determined at trial as a direct result of tarnishing Plaintiff's reputation for falsely representing to Kickstarter that Plaintiff engaged in copyright infringement;
(iii)   Awarding Plaintiff attorneys' fees and costs for defending the claim;
(iv)    Grant such other and further relief as it deems appropriate.

### AS AND FOR A SECOND CAUSE OF ACTION
### FOR FRAUD IN THE INDUCEMENT
### (against Marc Goldner)

115.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 114 as though fully set forth herein.

116.     In January 2017, Defendant Goldner, in his capacity of an officer of Golden Bell, approached Plaintiff with a proposal to publish and distribute Plaintiff's game "Pretending to Grownup."

117.     At the time of Goldner's approach, Plaintiff was not interested in selling "Pretending to Grownup" as all substantial work with respect to this game had been completed and Plaintiff had all the necessary funds to cover the expenses for the game's initial print run. Plaintiff had also secured all distribution channels.

118.     Plaintiff counter-offered Defendants to collaborate in other projects because for Plaintiff the idea to work with a publisher that can focus on the business side while Plaintiff focused on the creative side sounded quite attractive, particularly with Defendants' alleged "major" retailers and sales.

119.     In order to induce Plaintiff to enter into the Purchase Agreement with Golden Bell and include the game "Pretending to Grownup", Goldner promised that Golden Bell would timely ship all pre-orders of the game at no cost to Plaintiff and represented to Plaintiff that Defendants had purchase orders from "big box" retailers such as Toys R Us, Target, and Wal-Mart, and additionally that signing a deal with Defendants would result in  better marketing and exposure at toy conventions.  Defendant Goldner also represented that Plaintiff sales through Golden Bell would result in sales of "over 10,000 units per quarter."

120.     Upon information and belief, Defendants' representations relating to their purchase orders from "big box" retailers as well as their quarterly sales capacity, and projections with respect to Plaintiff's game were false and were fabricated with the sole purpose to induce Plaintiff into signing the Purchase Agreement.

121.     That Defendants intentionally provoked a false sense of urgency in Plaintiff, by asking him to execute the agreement after a sleepless night, without consulting an attorney and under the pretext that the Agreement must be announced to the public the same day.

122.    On the early morning of February 12, 2017, relying on Defendant Goldner's representations Plaintiff executed a Purchase Agreement with Golden Bell Entertainment, LLC in connection to four (4) games, the "Works" as follows: "Pretending to Grownup", "Turtles Riding Airships," "Parenting" and "Webcomic Name Game."

123.    Upon information and belief, Defendants did not have the intent to commercialize "Pretending to Grownup", and rather wanted simply to acquire Plaintiff's rights into the game as well as 10,000 copies of the game free of charge and later sell these units for approximately $29.95 per unit.

124.    Upon information and belief, Defendants intent was to commercially exploit the game, misappropriate the revenue and never pay Plaintiff the royalties Defendants had promised under the Purchase Agreement.

125.    That Plaintiff's entered into the Purchase Agreement relying on Defendant's misrepresentations.

126.    That under the terms of the Purchase Agreement, Plaintiff granted Golden Bell the right to produce future runs of "Pretending to Grownup", as well as the games "Turtles Riding Airships", "Parenting" and "Webcomic Name Game" as well as any tie-ins and spinoffs and consequently could not exploit same.

127.    That in addition, Plaintiff provided Defendants with approximately 10,000 free copies of the game worth hundreds of thousands of dollars and Defendants kept the benefit of these copies and never shared any income with Plaintiff.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against Defendant Marc Goldner:

(i)    Awarding Plaintiff monetary damages in an amount to be determined at trial but not less than $1,000,000 to compensate Plaintiff for his

24

        financial losses as a result of his reliance on Defendants' false
        promises;

(ii)     Awarding Plaintiff reasonable attorneys' fees due to Defendants'
        egregious conduct, as well as the costs and disbursements of this action.

(iii)    Grant such other and further relief as it deems appropriate.

### AS AND FOR A THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (against All Defendants)

128.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 127 as though fully set forth herein.

129.     Megan McKay was one of Plaintiff's Collaborators and the creator of the character "Unipegasaurus" featured in the game "Pretending to Grownup."

130.     Defendants knew of the existing collaboration between Plaintiff and McKay and the tangible and intangible value associated with Plaintiff's business relationship with McKay.

131.     Defendants Goldner knew that Megan McKay, was retaining the exclusive right on her character "Unipegasaurus" outside of the game, including without limitation, the right to sell plush toys in connection to said character.

132.     Plaintiff clearly disclosed this fact to Defendants verbally and in several emails as early as February 12, 2017.

133.     Notwithstanding Defendants' knowledge regarding Megan McKay's rights, Defendants intentionally changed the terms on the Purchase Agreement and refused to make any corrections regardless of having promised Plaintiff that corrections would be available in good faith.

134.     Plaintiff reached out to Defendants as early as 24 hours after Defendants rushed him into executing the Purchase Agreement, to inform that there was a mistake in the Megan McKay "Unipegasaurus" provision.

135.     Defendants simply ignored Plaintiff's requests and knowingly interfered with Plaintiff's relationship with McKay, destroyed their business relationship and later made Plaintiff pay for McKay settlement with Defendants out of Plaintiff's own pocket.

136.     On information and belief, Plaintiff alleges that Defendants had a clear and unequivocal intent to misappropriate the "Unipergasaurus" from inception despite their knowledge of Plaintiff's arrangement with McKay.

137.     In an effort to consolidate their attempts to misappropriate "Unipegasaurus" and knowing that McKay was vehemently claiming the rights over the character, Defendants filed a trademark application with the USPTO for the mark "Unipegasaurus" for among others plush dolls, plush toys and stuffed animals, without Plaintiff or Megan McKay's knowledge or consent.

138.     Plaintiff was expecting to collaborate with McKay in the future on many projects, including the "Pretending to Grownup" expansions in addition to a game entitled "Bork Report."

139.     In addition to destroying Plaintiff's business relationship with McKay, Defendants did not stop there and contacted Jonathan Rawlings, another valuable Plaintiff's Collaborator, who had a verbal agreement with Plaintiff to produce the game "Le Neckbeard."

140.     Defendants knew of the existing collaboration and the tangible and intangible value associated with Plaintiff's business relationship with Rawlings.

141.     However, Defendants pursued their own agenda to misappropriate Plaintiff's intellectual properly while ensuring that Plaintiff's Collaborators will no longer trust him.

26

142.     As a result of Defendants' actions, Plaintiff has substantially lost the goodwill he had acquired as a game developer in the industry.

143.     Defendants knew that the "Le Neckbeard" project and its commercialization was contingent upon the collaboration between Rawlings and Plaintiff.

144.     On November 21, 2018, following Plaintiff notice of termination to Defendants, Goldner approached Rawlings and misrepresented that Plaintiff "lied" in the past with respect to his intellectual property rights and that Plaintiff was unable to publish the game "Le Neckbeard" as Defendants had an option on Plaintiff's future works.

145.     Defendant Goldner knew that the statements he made to Rawlings were false, he knew that the statement would damage Plaintiff's reputation and would likely jeopardize Plaintiff's contractual relationship with Rawlings.

146.     Defendant Goldner intentionally and knowingly made the false statements to destroy Plaintiff's reputation and terminate the contractual relationship between Plaintiff and Rawlings.

147.     Defendants also interfered with Plaintiff's contractual relationships with the Kickstarter backers of the game "Pretending to Grownup."

148.     Defendants intentionally delayed fulfilling the "Pretending to Grownup" Kickstarter backer's orders.  As a result, Plaintiff received multiple complaints from the Kickstarter backers regarding that shipment which has further damaged Plaintiff's reputation.

149.     Upon information and belief, Defendants interfered with Plaintiff's existing contractual relationships to ensure that Plaintiff would no longer be able to

independently create games with third parties and continued to develop games for

Defendants against his will.

150.    Defendants tortious conduct has caused and will continue to cause

substantial damages to Plaintiff in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment
against all Defendants joint and severally:

(i)     Awarding Plaintiff monetary damages in an amount to be determined at
        trial but not less than $500,000 to compensate Plaintiff for his financial
        losses as a result Defendants' tortious interference with Plaintiff's
        contractual relationships;

(ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants'
        egregious conduct, as well as the costs and disbursements of this action.

(iii)   Grant such other and further relief as it deems appropriate.


### AS AND FOR A FOURTH CAUSE OF ACTION FOR LIBEL
### (as against Defendant Marc Goldner)


151.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1

through 150 as though fully set forth herein.

152.    Plaintiff was collaborating with the artist Jonathan Rawlings in the "Le

Neckbeard" project.

153.    Defendants knew of the existing collaboration and the tangible and

intangible value associated with Plaintiff's business relationship with Rawlings.

154.    Defendants knew that "Le Neckbeard" project and its commercialization

was contingent upon the collaboration between Rawlings and Plaintiff.

155.    On November 21, 2018, Marc Goldner sent an email to Jonathan

Rawlings stating that Plaintiff lied in the past with respect to his intellectual property and

claiming that Plaintiff was unable to publish the game Neckbeard because Defendants

had an option on Plaintiff's future works.

156.     Goldner knew that the statements made in his email to Rawlings were untrue when made, and Goldner also knew that the statement would damage Plaintiff's reputation and would jeopardize his contractual relationship with the Rawlings.

157.     Upon information and belief, at the time of making the defamatory statements to Rawlings, Mr. Goldner was motivated by actual malice in that he knew the statements were false.

158.     As a result of Defendant's defamatory statements, Plaintiff has been irreparably injured in this good name, business reputation, social standing, and has lost the esteem and respect of his acquaintances and business associates, many of them with very large global fanbases.

159.     The libelous statements made by Defendant were damaging to Plaintiff's character and business reputation and are defamatory per se.

160.     By reason of the foregoing, damages are presumed by statute due to harm caused to Plaintiff's business reputation and specific damages will be determined at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against Defendant Marc Goldner as follows:

(i)     Awarding Plaintiff monetary damages in an amount to be determined at trial;
(ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct, as well as the costs and disbursements of this action.
(iii)   Grant such other and further relief as it deems appropriate.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT
### (Against all Defendant Golden Bell)

161.    Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 160 as though fully set forth herein.

162.    That Golden Bell has breached the contract with Plaintiff by failing to disburse the agreed upon advances, provide Plaintiff with accurate royalty statements and pay royalties to Plaintiff as a result of the commercial exploitation of the Works as well as the Bonus Games.

163.    That on February 12, 2017 Plaintiff delivered the "Pretending to Grownup" digital files and the copies of the physical game on June 9, 2017.  See Declaration of Jason Wiseman.

164.    That Plaintiff was ready, willing and able to work and deliver the agreed upon "Pretending to Grownup" expansion packs. However, Defendant Goldner refused to pay Plaintiff the agreed upon $5,000 advance for each expansion and in response, Plaintiff informed Defendants he would not be delivering the expansions packs unless and until Defendants paid the agreed upon fee advance.

165.    That Plaintiff delivered the game "Turtles Riding Airships" to Defendants on June 15, 2017, including all final print ready files.

166.    Defendants however, failed to pay Plaintiff the second advance in the amount of $7,500, failed to deliver the complimentary copies to Plaintiff and Defendants have failed to commercially exploit the game and act in the best interest of the Plaintiff as required by Defendants agency commitment in the Purchase Agreement.

167.    That Plaintiff delivered all final print ready files to Defendants on February 13, 2018 for the game "Parenting is Easy."

168.    Defendants failed to pay Plaintiff any royalties in connection to the sales of the game "Parenting is Easy" and have failed to send Plaintiff accurate royalty statements accounting for the sales of the game notwithstanding the fact that Defendants are selling "Parenting is Easy" for $49.95 per unit.

169.    Defendants also failed to pay Plaintiff $8,125 in agreed upon advances regarding the game "Parenting is Easy."

170.    That Plaintiff delivered the digital files of "Webcomic Game" to Defendants on October 2, 2018. Yet, Defendants failed to print and release this game and thus, Plaintiff have not received any royalties in connection to the sales of the game "Webcomic Name Game." Defendants had the obligation to pay royalties to Plaintiff and consequently the obligation to commercially exploit the game. Defendants did not pay Plaintiff an advance in connection to this game.

171.    In addition to the four (4) Works under the Purchase Agreement, Plaintiff agreed to deliver five additional Bonus Games pursuant to several Addenda to the Purchase Agreement that Plaintiff signed with Defendant Golden Bell under duress.

172.    Defendants did not pay advances or royalties for any of these Bonus Games except for a negligible advance in the amount of $2,500 for "Frosty Cats" which Plaintiff used to cover the costs to make the game.

173.    Plaintiff has complied with all of his obligations under the Purchase Agreement while creating and delivering to Defendants additional "Bonus" games in exchange for absolutely no consideration from Defendants, in breach of the Purchase Agreement and addenda.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants joint and severally:

(i)     Awarding Plaintiff monetary damages as a result of Defendants' breach in an amount to be determined at trial but not less than $1,000.000;

(ii)    Awarding Plaintiff reasonable attorneys' fees as provided for in the Purchase Agreement;

(iii)   Grant such other and further relief as it deems appropriate.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (plead in the alternative against Golden Bell)

174.    Plaintiff repeat and reiterate the allegations contained in paragraphs 1 through 173 as though fully set forth herein.

175.    By virtue of the Purchasing Agreement, Golden Bell owed Plaintiff a duty of good faith and fair dealing.

176.    Defendants violated the duty of good faith and fair dealing by making false promises and misrepresentations to Plaintiff knowing that Defendants did not intend to abide by the terms of any of the Agreements with Plaintiff.

177.    Upon information and belief, Defendants made promises to Plaintiff solely for purposes of gaining leverage and securing an agreement that would serve to pressure Plaintiff into assigning his future works to Defendants so that Defendants could benefit from Plaintiff's content.

178.    Upon information and belief, Defendants business model consists of executing agreements with highly talented artists for a limited engagement, that often includes an assignment of rights on a small number of the artist's works and later use coercive tactics to secure additional rights by threatening to file legal action and destroy the artist's reputation.

179.     Defendants further violated the covenant of good faith and fair dealing by guaranteeing that changes could be made to the Purchase Agreement upon Plaintiff's request in view of the short time Plaintiff had to review the Purchase Agreement.

180.     Defendants also breached the covenant of good faith and fair dealing by attempting to secure registrations of trademarks Defendants knew belonged to Plaintiff and his collaborators.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants joint and severally as follows:

(i)     Awarding Plaintiff monetary damages as a result of Defendants' breach of the covenant of good faith and fair dealing in an amount to be determined at trial but not less than $1,000.000;

(ii)    Awarding Plaintiff reasonable attorneys' fees as provided for in the Purchase Agreement;

(iii)   Grant such other and further relief as it deems appropriate.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

181.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 180 as though fully set forth herein.

182.     Pursuant to the Collaboration Agreement, Defendants agreed to act as Plaintiff's agent in in connection with the sale or other distribution of the Works, among others.

183.     As agents, Defendants owed Plaintiff fiduciary duties to act in accordance with Plaintiff best interest, to protect Plaintiff's reputation, commercially exploit the Works and pay Plaintiff royalties pursuant to the Collaboration Agreement.

184.     Defendant's failure to pay Plaintiff, their threats to forego shipping the game units to the Kickstarter backers, and their conduct in using the Kickstarter's pre-orders as leverage to gain further commercial advantage over Plaintiff were self-serving and against Plaintiff's interest.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants joint and severally as follows:

(i)     Awarding Plaintiff monetary damages in an amount to be determined at trial;
(ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct;
(iii)   Grant such other and further relief as it deems appropriate.

## AS FOR AN EIGHTH CAUSE OF ACTION FOR UNJUST ENRICHMENT
### (Against all Defendants)

185.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 184 as though fully set forth herein.

186.     Defendants have benefited at the Plaintiff's expense by misappropriating nine games belonging to Plaintiff without providing Plaintiff with fair and reasonable compensation.

187.     Consequently, it would be against equity and good conscience to allow Defendant to retain what the Plaintiff seeks to recover.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants joint and severally as follows:

(i)     Awarding Plaintiff monetary damages in an amount to be determined at trial;
(ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct;
(iii)   Grant such other and further relief as it deems appropriate.

## AS AND FOR A NINTH CAUSE OF ACTION FOR CONSTRUCTIVE TRUST
### (Against all Defendants)

188.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 187 as though fully set forth herein.

189.     That Defendant Goldner approached Plaintiff to enter into a collaboration, termed a "partnership" to sell and distribute Plaintiffs games.  Defendant Goldner pursued Plaintiff until he formed a relationship of trust and confidence.

190.     Defendant Goldner then made express promises to Plaintiff of a large distribution channel, "big box" retails, outstanding sales and income expectations.

191.     In reliance of Defendants promises, Plaintiff transferred his intellectual property rights in nine games to Defendants.

192.     As a result of Plaintiff's reliance and transfer, Defendants have been unjustly enriched at Plaintiff's expense.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment against all Defendants as follows:

    (i)     Awarding Plaintiff monetary damages in an amount to be determined at trial;

    (ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct;

    (iii)   Grant such other and further relief as it deems appropriate.

## AS AND FOR A TENTH CAUSE OF ACTION FOR AN ACCOUNTING
### (against All Defendants)

193.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 192 as though fully set forth herein.

194.     Defendant Golden Bell has exploited the Works without providing Plaintiff with accurate royalty statements or accounting for the sale of the Works and the Bonus Games.

195.     Plaintiff has requested royalty statements, but Defendants have failed and refused to provide Plaintiffs with accurate statements reflecting Defendants commercial exploitation of the Works and the Bonus Games.

196.     Plaintiff is entitled to receive royalties and an accounting is necessary to determine the amount of royalties due to Plaintiff to date.

WHEREFORE, Plaintiff respectfully requests that this Court enters judgment as follows:

    (i)     Granting Plaintiff an accounting to determine Defendants' gross sales arising from the commercial exploitation of the Works and the Bonus Games;

    (ii)    Grant such other and further relief as it deems appropriate.


**AS FOR AN ELEVENTH CAUSE OF ACTION FOR A DECLARATORY JUDGMENT**
**(against All Defendants)**

197.     Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 196 as though fully set forth herein.

198.     Plaintiff executed a Purchase Agreement with Defendant Golden Bell as well as three Addenda pursuant to which Plaintiff assigned the rights on certain Works to Defendant in exchange for advances and a fixed royalty rate on net sales.

199.     The Purchase Agreement dated February 12, 2017 covered the works "Pretending to Grownup", "Parenting", Turtles Riding Airships" and "Webcomic Name Game." The parties agreed and understood that the Purchase Agreement involved Defendants' acquisition of the Works from Plaintiff.

200.     On July 25, 2017, after receiving multiple threats from Defendants, Plaintiff executed a Second Addendum adding the games "Frosty Cats," "Message in a Bottle." Plaintiff delivered these two additional games to Defendants.

201.     Plaintiff executed the Second Addendum under duress because Defendants threatened to forego delivery of the "Pretending to Grownup" copies to the Kickstarter backers which would consequently affect Plaintiff's reputation in a platform where Plaintiff has successfully made his career as a game developer.

202.     Defendant Goldner knew that reputation is crucial in Plaintiff's industry and that further delays delivering the copies of "Pretending to Grownup" to the Kickstarter backers would significantly damage Plaintiff's reputation.

203.     That Defendant's used the stringent deadlines for delivery of "Pretending to Grownup" to exert pressure over Plaintiff and force him to sign the First and Second Addenda to the Purchase Agreement.

204.     As a result of Goldner's threats Plaintiff was forced to execute the Addenda foregoing his rights to copies of "Pretending to Grownup", advances relying on Goldner's misrepresentations under extreme pressure.

205.     That on August 28, 2017 Plaintiff executed a Third Addendum for the game "Die Trying" again with the understanding that the Addendum would be limited to that game.

206.     Defendants acknowledged that the Purchase Agreement and the Addendums were limited to the Works identified in the agreements during the initial negotiations of the Purchase Agreement and subsequently when Defendants offered to acquire Plaintiff's business, portfolio and future works and Plaintiff rejected the offer.

207.     Defendants submitted two trademark applications to the USPTO for "Heck: A Tiny Card Game" and "Drinking Quest," fraudulently claiming that Defendants were using the marks in commerce. Defendants submitted snapshots of Plaintiff's Kickstarter campaigns as proof of Defendants purported use of the marks in commerce, which constitutes a serious misrepresentation to a government agency.

208.     Defendants relied on Plaintiff's use of the marks to submit the applications, as they claimed use of the mark "Drinking Quest" in commerce since December 21, 2011. However, Defendant Golden Bell was in fact established four years later, in 2015. It cannot be disputed that Plaintiff, created, developed and commercialized the mark "Drinking Quest" since December 31, 2011 and purchased a domain name for that purpose.

209.     Plaintiff never assigned Defendants his intellectual property in connection to "Drinking Quest" or "Heck: A Tiny Card Game" and there is no agreement between the parties evidencing an assignment.

210.     Because of Defendants constant threats to Plaintiff's business and reputation in the industry, Plaintiff is compelled to seek a declaratory judgment. WHEREFORE, Plaintiff respectfully requests that this Court enters a declaratory judgment against all Defendants, joint and severally as follows:

(1) Declaring that the Purchase Agreement is void because it was obtained by Defendants through false promises with the sole objective to misappropriate Plaintiff's Works;
(2) Declaring that Golden Bell does not have any option or any ownership interest in Plaintiff's past, present and future works of authorship that Plaintiff created or will create independently of the Purchase Agreement with Golden alone or in collaboration with third parties including, without limitation the existing games the games "Heck: A Tiny Card Game" and "Drinking Quest";
(3) Declaring that Plaintiff is the sole and exclusive owner of the trademarks in the games "Heck: Tiny Card Game" and "Drinking Quest",

(4) Declaring that the First, Second and Third Addendum are void because Plaintiff entered into these agreements under duress and/or fraud;

(5) Granting such other and further relief as it deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Jason Wiseman hereby demands a trial by jury pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated: New York, New York
February 11th, 2019

CHINTA, PERDOMO, BERKS & FRATANGELO, LLP

Francelina M. Perdomo (#4429)
Antoaneta Tarpanova (#2287)
Attorneys for Plaintiff
17 State Street, Suite 4000
New York, NY 10004
(212) 274-1261
fperdomo@chintaperdomo.com
atarpanova@chintaperdomo.com